DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Jillian H., ("Mother") appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her child, D.H., and placed him in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Jillian is the mother of D.H., born July 21, 2006. The biological father of the child is married to Mother and was involved in the trial court proceedings, but is not a party to the present appeal. *Page 2 
 {¶ 3} CSB initially became involved with this family in connection with an older sibling. That child had numerous special medical needs and the parents eventually acknowledged their inability to care for the two-year-old child, voluntarily relinquishing their parental rights to him on July 11, 2006. Ten days later, D.H. was born, and the agency removed him directly from the hospital because the parents had apparently failed to remedy some of the conditions that had brought his sibling into care. CSB's complaint, filed on July 24, 2006, alleged that D.H. was dependent and sought temporary custody. Following adjudicatory and dispositional hearings, the trial court found D.H. to be a dependent child and placed him in the temporary custody of the agency.
 {¶ 4} The trial court adopted a case plan which required both parents to: (1) obtain and maintain housing for at least six months and obtain and maintain employment or a steady source of verifiable income to provide for the basic needs of their child; (2) complete parenting assessments, parenting classes, and implement what they have learned; (3) avoid physical or verbal aggression, maintain self-control, and participate in the Stop the Cycle Program; and (4) meet the physical, emotional, educational, and medical needs of D.H. on a consistent basis. In addition, Father was separately required to: (1) complete drug and alcohol assessments and complete all recommendations, including random drug screens as requested; and (2) attend anger management classes and/or individual counseling to address anger and follow all recommendations. Mother was *Page 3 
separately required to: (1) actively participate in services with Blick Clinic, including completing a mental health assessment, counseling, and any recommendations; and (2) discuss the issue of aggression with her counselor.
 {¶ 5} CSB moved for permanent custody on June 13, 2007. Shortly thereafter, the parents moved for a six-month extension of temporary custody. Following a hearing on both motions, the trial court denied the parents' motion for temporary custody and granted CSB's motion for permanent custody. The trial court entered findings that D.H. could not be placed with either parent within a reasonable time or should not be placed with either parent and that permanent custody was in the best interest of the child. Mother appeals and assigns two errors for review. Because the two assignments of error are related, they will be considered together.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY OF [D.H.] TO SUMMIT COUNTY CHILDREN SERVICES BECAUSE THE [CHILD] COULD NOT BE PLACED WITH [HIS] MOTHER WITHIN A REASONABLE TIME WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS CONTRARY TO LAW." ASSIGNMENT OF ERROR II "THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT-MOTHER'S MOTION FOR A FIRST SIX-MONTH EXTENSION OF TEMPORARY CUSTODY." *Page 4 
 {¶ 6} In her supporting argument, Mother contends that the trial court erred in finding that the child could not be placed with her within a reasonable time and in finding that it was in the best interest of the child to be placed in the permanent custody of CSB. She asserts that the trial court should have granted a six-month extension of temporary custody instead.
 {¶ 7} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95,99.
 {¶ 8} The trial court may terminate parental rights and grant custody of a child to the moving party, therefore, only if it finds by clear and convincing evidence that both prongs of the above test are met. Clear and convincing evidence is more than a mere preponderance of evidence.Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. Instead, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as *Page 5 
to the facts sought to be established. In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368. An appellate court will not reverse a trial court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. Id.
 {¶ 9} The trial court found that the first prong of the permanent custody test was satisfied because D.H. could not be returned to either parent within a reasonable period of time or should not be returned to their care. In reaching this conclusion, the trial court made several predicate determinations pursuant to R.C. 2151.414(E). As to Father, the trial court found that he had failed to remedy the concerns regarding anger and substance abuse that brought the child into care despite the assistance of CSB by way of numerous referrals. See R.C. 2151.414(E)(1). The trial court also found that Father had demonstrated a lack of commitment to the child as a result of his sporadic visitation. See R.C.2151.414(E)(4). Next, as to Mother, the trial court found that she was unable to provide D.H. with adequate and permanent care due to her mental and physical disabilities. See R.C. 2151.414(E)(2). That section provides as follows:
 "Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of [R.C. 2151.353]." *Page 6 
Upon determination, by clear and convincing evidence, that one or more of the subsections of R.C. 2151.414(E) are applicable to each of the child's parents, the trial court was then obligated, as it did, to enter a finding that the child could not or should not be placed with either parent within a reasonable time. See R.C. 2151.414(E).
 {¶ 10} In regard to the second prong of the permanent custody test, the trial court found that permanent custody was in the best interest of the child, and made findings in regard to each of the best interest factors set forth in R.C. 2151.414(D). Mother challenges the trial court findings on both prongs of the permanent custody test as being unsupported by clear and convincing evidence and contrary to law.
 {¶ 11} In response to the trial court determination pursuant to R.C.2151.414(E)(2) that Mother's disabilities prevented her from providing an adequate permanent home for the child, Mother argues that her disabilities are not so severe that she is unable to care for her child. Mother concedes that she suffers from Rubella Syndrome, a condition that results in her being small in stature and causes parts of her body to develop and/or age rapidly. She also admits that she is legally blind and is an epileptic. However, in support of her position that she is able to care for her child, she points to evidence that she obtained proper prenatal care and that she has maintained a clean and appropriate home, employment, and a relationship with her counselor. Mother also notes that she does not have a substance abuse problem. Mother admitted that she cannot take care of D.H. *Page 7 
without her husband's help, but she believes that they could take care of the child together if her husband were to stop drinking. She also admitted that Father has continued to use alcohol and marijuana during this case.
 {¶ 12} The trial court acknowledged that the parents had done many things well: they maintained appropriate housing, Mother's income is sufficient to support the family, and Mother has been compliant and consistent in caring for her own medical and mental health needs. The trial court also noted evidence that Mother understands the importance of home safety, has a desire to raise her child, and is able to manage her own medications. Nevertheless, the trial court concluded that Mother is unable to meet the child's needs and that Father has not resolved the concerns regarding his anger and substance abuse. Equally important, according to the trial court's decision, is Father's lack of commitment to the child, as demonstrated by his very sporadic visitation.
 {¶ 13} While Mother's physical limitations present challenges, those matters alone will not necessarily be determinative of parenting ability. The record before this Court, however, demonstrates that Mother's chronic conditions and disabilities have impacted her fundamental ability to parent her child. According to the evidence before the trial court, Mother lacked a basic understanding of her child's needs and she was incapable of appropriate interaction with D.H. Furthermore, CSB made reasonable efforts to accommodate Mother's needs, referring Mother to parenting classes, mental health counseling, *Page 8 
domestic violence programs, and Help Me Grow services. These service providers apparently were not able to resolve all of Mother's problems. For example, after several sessions of Help Me Grow, that agency indicated that it had provided services to Mother, but she had not benefited from them. A parenting assessment was included in the record and relied upon by the trial court. It cited Mother's lack of strategies for discipline and lack of understanding of future developmental milestones.
 {¶ 14} Carlotta Pace, the CSB caseworker assigned to this case, testified to her concerns regarding Mother's ability to parent D.H. She believed that Mother's limitations affected her ability to care for the child and that Mother continues to need assistance in caring for the child. Similarly, Jennifer Clink, the guardian ad litem, testified that Mother really loves her son and does the best she can, but that while Mother had improved in her ability to provide basic care to the child, neither Mother nor Father was capable of caring for the child in an unsupervised setting.
 {¶ 15} Pace offered specific examples that supported her opinion. According to the caseworker, often Mother would not hold D.H. appropriately for feeding or changing, and that as the child grew, it had become more difficult for her to maneuver the child into a car seat or to carry the child's equipment. Importantly, she also testified that Mother lacked an "instinct of knowing * * * the baby's needs." The caseworker said that Mother has problems if the baby is *Page 9 
moving or gets fussy. Pace explained that Mother tries very hard, but has a difficult time since D.H. is a growing, active child.
 {¶ 16} In addition, Mother requires assistance while walking with the child because of her vision limitations. The caseworker claimed that Mother's vision limitations once resulted in the child bumping his head during a walk with Mother, though Mother disputed that this occurred. Even after a year, case aides found it necessary to sit just across the room or walk directly behind Mother and child-always keeping them in sight and close enough to reach them very quickly. The caseworker felt that Mother needed to work with the child more and, when she missed visits, that caused concern. In an effort to address this need, the agency was willing to offer Mother two-hour visitations three times per week, much more than the typical visitation schedule. In the three months preceding the hearing in this matter, Mother attended approximately 18 out of 26 scheduled visits. While the caseworker had observed some improvement in Mother's ability to care for the child, she believed Mother was still unable to have unsupervised time with D.H.
 {¶ 17} The guardian ad litem testified similarly that Mother does not always interact well with the child. For example, Mother had difficulty with multitasking: she could focus on changing the baby, but could not interact with the child while she was doing that. Also, Mother might not notice that the child had spit up and needed attention unless she was told by an aide. At that point, she was able to clean him up and change his clothes, but, again, did not interact with the *Page 10 
child while she did so. The guardian ad litem felt that Mother tended to talk "at him" as opposed to "interacting with him." She also stated that Mother interacted more with the adults in the room than with her child. Mother, she said, tended to hold the baby facing away from her, so there was a lack of facial interaction between them. The point was made on cross-examination that, although there was a great deal of redirection and many suggestions by case aides, Mother may not have been specifically advised by a case aide to turn the child around to face her. Nevertheless, the fact remains that there is a significant pattern of a lack of interaction between Mother and D.H.
 {¶ 18} Furthermore, the guardian ad litem did not believe that the child was bonded to Mother, despite the frequent visitation opportunities. She stated that the child would cling to Mother's shirt more in nervousness about the way he was being held, than in a bonded gesture. She explained, in general, that the child's attention would easily go from Mother to others in the room. He did not turn to her when he was frightened, but, rather, was almost indifferent to her.
 {¶ 19} The caseworker also expressed concern with Father's history of substance abuse and his lack of progress on his case plan objectives. Though Father completed several assessments and initiated at least five different programs, he did not successfully complete any of them. According to the caseworker, Father had failed to maintain sobriety. The caseworker testified that she had specifically talked with Father about how his substance abuse issues affected his *Page 11 
ability to provide support to his family. She stated, and Mother's testimony confirmed, that Father continued to use alcohol and marijuana. While Father had expressed the desire to comply with this objective, he had not made any real progress at all. In addition, Father is not employed and has no income. There was no evidence of domestic violence by Father during this case, but neither had he demonstrated that he had satisfied that case plan objective. In the first case involving an older sibling, both parents denied the existence of domestic violence until Mother appeared with a black eye.
 {¶ 20} The caseworker and the guardian ad litem both testified that Father appears to be able to care for the child when he is sober and he is able to do multiple tasks with the child. Father was most helpful and appropriate when he attended visitations with Mother. He knows how to change diapers, feed the child, and redirect the child's attention. Father was very interactive with the child and was able to redirect him if he was fussy. Even when the child slept in his arms, Father would talk to him, touch him, and play with him.
 {¶ 21} However, Father attended only a small number of visits — seven in the last three months, and 13 over the course of a year, according to the caseworker. This is despite Mother's repeated urgings to attend visits with her and notwithstanding the caseworker's explanations of how critical his attendance at visitation was to the reunification of the family. The caseworker felt that Father needed more consistency in dealing with the child hands on. Mother believed *Page 12 
Father attended more than 13 visits, but conceded that she repeatedly asked him to attend more visits with her throughout this case.
 {¶ 22} Aside from visitation, Father has demonstrated minimal compliance with any of his case plan objectives. He failed to address concerns of domestic violence, substance abuse, anger management, or employment. Mother testified that Father has continued to use alcohol and marijuana, commenting that lots of people smoke marijuana. Numerous requests for drug screens were made, but only two requests were fulfilled. Consequently, Father failed to demonstrate that he could provide the assistance Mother requires with any degree of consistency. The caseworker concluded that she would be concerned to leave the child even with both parents together because Mother is not able to care for the child herself and Father has not established sobriety such that he could consistently provide Mother with the assistance that is necessary.
 {¶ 23} The trial court determined that Mother was not able to provide D.H. with adequate and permanent care within the home, and this conclusion is clearly and convincingly supported by the evidence before the court. Not only is Mother unable to provide the consistent physical care that the child requires, but she also lacks the ability to understand the child's needs and interact appropriately with him. Accordingly, Mother's challenge of the finding on the first prong of the permanent custody test must fail. *Page 13 
 {¶ 24} Next, in determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 25} The agency is required to prove by clear and convincing evidence that permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re *Page 14 Adoption of Holcomb, 18 Ohio St.3d at 368, quoting Cross, 161 Ohio St. at paragraph three of the syllabus.
 {¶ 26} Evidence regarding the interaction and interrelationship between Mother and the child fails to support Mother's position. As stated above, despite a schedule permitting two-hour visits three times weekly, the guardian ad litem indicated that there was no bonding between Mother and D.H. Mother had difficulty interacting on a personal level with her child. Mother tended to interact more with case aides and others in the visitation room than with her child. Furthermore, the child did not engage with Mother and tended to look to others for support.
 {¶ 27} Father visited with his son only sporadically and has not demonstrated the type of commitment one would wish from someone who sought reunification with a child. No other relatives had a relationship with the child.
 {¶ 28} The child was said to be well bonded with the foster mother and the child was extremely happy in that placement. He was said to always have a smile on his face and played happily with toys as well as with other children. He was developmentally on target. The foster mother was willing to adopt the child if that opportunity arose.
 {¶ 29} As to the second best interest factor, the guardian ad litem stated, on behalf of the one-year old child, that she believed it would be in the best interests of D.H. to be placed in the permanent custody of CSB. *Page 15 
 {¶ 30} The third best interest factor requires consideration of the custodial history of the child. D.H. never lived with his parents. At the time of the permanent custody hearing, he had been in foster care with the same family for 14 months.
 {¶ 31} As to the fourth best interest factor, there was evidence before the trial court that the child was in need of a legally secure placement and that there were no suitable friends or relatives willing to provide for his care. The foster parent, who also had a two-year-old child, was willing to adopt D.H. The caseworker testified that permanent custody was in the best interests of the child.
 {¶ 32} The evidence clearly established that Mother cannot provide the appropriate care, attention, and interaction that her child requires. Father has not established that he can consistently provide the care that is necessary either. Mother urges that a nearby friend and a nearby relative could come to her home and assist her if necessary. The deficiencies outlined by the caseworker and guardian ad litem, however, may not be resolved by that sort of assistance.
 {¶ 33} As to each of the best interest factors, Mother essentially argues that a six-month extension would allow her to improve her relationship with D.H., develop her parenting skills, and permit Father to have additional time to complete his case plan objectives. The evidence fails to support these claims. Despite attending visitation fairly consistently, Mother has not developed a bond with her child or demonstrated good quality interaction with him. The mentoring agency, *Page 16 
Help Me Grow, indicated that it would no longer assist Mother as they had already provided the full scope of their services to the family and Mother had not benefited from them.
 {¶ 34} In regard to the possibility that Father might complete his case plan objectives within a six-month extension, Father has demonstrated virtually no participation on his case plan and has engaged in very limited visitation. There is no reason to believe that an extension of six months would have made a difference in this case, nor is there evidence that such an extension would have been in the best interest of the child. See R.C. 2151.415(D)(1). See, also, In reD.C., 9th Dist. No. 23484, 2007-Ohio-2344, at ¶ 32.
 {¶ 35} Upon review, the record demonstrates that there was clear and convincing evidence before the trial court supporting a conclusion that permanent custody was in the child's best interest. Consequently, the trial court did not err in denying Mother's motion for an extension of temporary custody, terminating Mother's parental rights, and placing D.H. in the permanent custody of CSB. Mother's two assignments of error are overruled.
 III. {¶ 36} Mother's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
 Judgment affirmed. *Page 17 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
 WHITMORE, J. DICKINSON, J. CONCUR